IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TRI-CITIES RESTORATION LLC et al, <br><br> Plaintiffs, <br><br> v. <br><br> ERC SPECIALISTS, LLC et al, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:24-cv-00816-RJS-DBP <br><br> Chief District Judge Robert J. Shelby <br><br> Chief Magistrate Judge Dustin B. Pead |

Before the court is Defendants' Motion to Dismiss.[1] Having reviewed the Motion and all associated briefing, the court GRANTS the Motion.[2]

## BACKGROUND

This case arises out of Defendants' preparation of Plaintiffs' Employee Retention Tax Credit (ERTC) claim.[3] Defendant ERC Specialists, LLC (ERCS) is a company that aids businesses in qualifying for and maximizing CARES Act-related tax credits.[4] Plaintiffs consist of several entities specializing in cleaning, restoration, and construction services.[5] Plaintiff Quality Restoration Inc. owns and has control over the remaining Plaintiffs, and the relationship between Plaintiffs' businesses requires they be characterized as a "controlled group" under 26 U.S.C. § 52.[6]

---

[1] Dkt. 28, *Motion to Dismiss* (*Motion*).

[2] Pursuant to DUCivR 7-1(g), the court determines oral argument is unnecessary and resolves the Motion based on the parties' written memoranda.

[3] Dkt. 26, *Plaintiffs' First Amended Complaint* (*FAC*) ¶ 1.

[4] *Id.* ¶ 34.

[5] *Id.* ¶ 69.

[6] *Id.* ¶¶ 69–70.

For context, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act in 2020 in response to the economic fallout of the COVID-19 pandemic in the United States.[7] The CARES Act included a provision for a federal tax credit: the ERTC. Eligible businesses and tax-exempt organizations that had employees and were affected by the pandemic could claim the ERTC under certain circumstances.[8] To claim the ERTC retroactively, a business filing quarterly employment tax returns could file a Form 941-X for each payroll tax quarter in which it was found to be eligible with the Internal Revenue Service.[9] Upon filing of the proper form, an eligible business would be issued a refund for overpayment of tax for the specified quarters.[10]

Defendant ERCS allegedly uses an expansive marketing network of affiliates to drive business to ERCS.[11] More specifically, ERCS targets podcasters, YouTube content creators, and others as affiliates, and ERCS offers them money if they are willing to solicit business from their audiences.[12] ERCS pays these affiliates a certain amount based on (1) the amount of the credit ultimately delivered and paid, and (2) how many people the affiliate has filtered to ERCS.[13] One example of an affiliate is "Coach Nick" who posted a YouTube video encouraging others to sign

---

[7] *See* Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (codified as amended in scattered sections of 15 U.S.C., 26 U.S.C., 21 U.S.C., 42 U.S.C., 33 U.S.C., 2 U.S.C., 17 U.S.C., and 22 U.S.C.).

[8] *FAC* ¶ 20; *see also* Employee Retention Credit, IRS, https://www.irs.gov/coronavirus/employee-retention-credit (last updated May 29, 2025).

[9] *FAC* ¶ 22; *see also* Employee Retention Credit, IRS, https://www.irs.gov/coronavirus/employee-retention-credit (last updated May 29, 2025).

[10] *FAC* ¶ 22; *see also* Employee Retention Credit, IRS, https://www.irs.gov/coronavirus/employee-retention-credit (last updated May 29, 2025).

[11] *FAC* ¶ 24.

[12] *Id.* ¶¶ 25–27.

[13] *Id.* ¶¶ 28–30.

up for the affiliate program with ERCS while describing ERCS as a "CPA company" and telling his viewers ERCS can help obtain the ERTC "even if their business closed down."[14] He also clarified that as an affiliate, he gets commissions from ERCS, which he described as a "CPA company" that is "solely focused specifically on the Employee Retention Credit."[15]

Plaintiffs allege other affiliates used similar language in their online content to encourage potential customers to sign up quickly for ERCS's services as the available funds would not "last forever."[16] Affiliates also warned customers that "the longer you wait, the longer it will take."[17] Plaintiffs allege the affiliate-based structure created a multi-level marketing scheme, where affiliates were charged with gathering basic client information and documents and sending the customer packages to ERCS.[18] ERCS would then review the documents, provide qualification analyses, get necessary client signatures, file the documents with the IRS, and collect fees.[19]

ERCS and affiliates discouraged potential clients from consulting with tax professionals regarding their eligibility for the ERTC.[20] Instead, ERCS directed prospective clients to complete an "online intake questionnaire,"[21] and Defendants repeatedly represented that a completed questionnaire contained all the information necessary to determine whether or not a client would qualify for an ERTC.[22] At all times relevant to the Complaint, Plaintiffs allege

---

[14] *Id.* ¶¶ 32–33.

[15] *Id.* ¶ 33.

[16] *Id.* ¶ 36.

[17] *Id.*

[18] *Id.* ¶ 39.

[19] *Id.*

[20] *Id.* ¶ 53.

[21] *See id.* ¶¶ 41–47.

[22] *See id.*

Defendants and their affiliates marketed ERCS as a company that specializes in maximizing Employee Retention Credit funding for small businesses and had specialized knowledge and skillsets to conduct proper qualification analyses.[23]

In 2022 and relying on representations made by Defendants as to the accuracy of their qualification analyses, Defendants convinced Plaintiffs to allow ERCS to prepare Plaintiffs' Form 941-X.[24] Plaintiffs entered into separate contracts with ERCS to determine their respective eligibility to claim the ERTC,[25] and they agreed to pay ERCS a contingency fee totaling 15% of the credit amount issued by the IRS.[26]

Defendants provided the online intake questionnaire to Plaintiffs to determine Plaintiffs' potential eligibility to obtain the ERTC.[27] Plaintiffs completed the form, though they later realized the questionnaire was insufficient to determine a valid ERTC claim.[28] For example, the questionnaire did not inquire into clients' classifications as a controlled group, which must be fully analyzed and considered to properly determine eligibility for ERTC.[29] Indeed, a 2021 IRS Notice provides that "[a]ll entities that are members of a controlled group of corporations or trades or businesses under common control . . . are treated as a single employer for purposes of applying the employee retention credit."[30] Relying on the completed questionnaire, and failing to consider the fact Plaintiffs comprised a controlled group and other details related to Plaintiffs'

---

[23] *Id.* ¶¶ 40–41.

[24] *Id.* ¶ 68.

[25] *Id.* ¶¶ 71–75.

[26] *Id.* ¶ 77.

[27] *Id.* ¶ 42.

[28] *Id.*

[29] *Id.* ¶ 43–44 (citation omitted).

[30] *Id.* ¶ 44 (citation omitted).

4

qualification for the ERTC, ERCS proceeded to qualify Plaintiffs for various quarters between 2020 and 2021.[31] For all quarters, Defendant Geri Bohn executed the 941-X forms for ERCS.[32] ERCS identified a total of over two million dollars of tax credits for Plaintiffs, and Defendants invoiced Plaintiffs $360,437 for their services.[33] Plaintiffs ultimately paid Defendants $351,303.[34]

Thereafter, it was determined Plaintiff did not qualify for the ERTC.[35] Accordingly, Plaintiffs utilized the Voluntary Disclosure Program in September 2024, and refunded 80% of the claimed credit to the IRS to avoid any fines and penalties.[36] For context, the Voluntary Disclosure Program is an application process introduced by the IRS that allows certain taxpayers who received but were not entitled to the ERTC to self-identify and repay a portion of the credit.[37] If a company meets certain requirements and is accepted into the program, the company is required to repay only 80% of the claimed credit for the quarters in which it applied to the program, and the IRS does not subject the party to an employment tax audit for the credit resolved within the terms of the program.[38]

---

[31] *Id.* ¶¶ 83–86.

[32] *Id.* ¶ 87.

[33] *Id.* ¶ 94; Dkt. 32, *Plaintiffs' Response to Defendant's Motion to Dismiss* (*Opposition*) at 7 n.7.

[34] *FAC* ¶ 94; *Opposition* at 7 n.7.

[35] *FAC* ¶ 95.

[36] *Id.* ¶¶ 96–97.

[37] *Id.* ¶ 97 n.17 (citing *Frequently Asked Questions about the Employee Retention Credit Voluntary Disclosure Program*, Internal Revenue Service, https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit-voluntary-disclosure-program (last visited July 18, 2025)).

[38] *See id.* (citing *Frequently Asked Questions about the Employee Retention Credit Voluntary Disclosure Program*, Internal Revenue Service, https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit-voluntary-disclosure-program (last visited July 18, 2025)).

Pursuant to the terms of the parties' agreements, Defendants retained Plaintiffs' ERTC commission payments even after Plaintiffs voluntarily returned 80% of the claimed credit.[39] Plaintiffs subsequently filed this lawsuit in October 2024, seeking to recover the ERTC commission paid to Defendants.[40] Plaintiffs assert claims for violations of (1) the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), (2) the Utah Pattern of Unlawful Activity Act, and (3) the Utah Truth in Advertising Act. Plaintiffs accuse Defendants of marketing ERCS as a company specializing in maximizing ERC funding for small businesses on its website, discouraging clients from relying on CPA's and other tax professionals, and intentionally displaying fake client testimonials from paid affiliates.[41] Defendants filed the present motion in March 2025.[42] The Motion is fully briefed and ripe for review.[43]

## LEGAL STANDARD

Defendants challenge Plaintiffs' Article III standing to sue, but they argue Rule 12(b)(6) is the proper vehicle to dismiss the case on this ground.[44] Article III of the Constitution restricts federal judicial authority to cases and controversies,[45] and whether a plaintiff has Article III

---

[39] *See id.* ¶ 110; *Opposition* at 10.

[40] *See generally FAC*; *Opposition* at 10 ("[T]his is the money that Plaintiffs seek to recover.").

[41] *FAC* ¶¶ 40, 53–56, 98–130.

[42] *Motion*.

[43] *Motion*; *Opposition*; Dkt. 36, *Reply in Support of Motion to Dismiss* (*Reply*).

[44] *Motion* at 3–4.

[45] U.S. Const. art. III, § 2, cl. 1; *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).

standing is a jurisdictional issue to be raised by a Rule 12(b)(1) motion.[46] Because Plaintiffs do not challenge Defendants' jurisdictional arguments on this ground, the court will consider Defendants' standing challenge under Rule 12(b)(1).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms: facial attacks and factual attacks.[47] A facial attack challenges the sufficiency of the complaint, while a factual attack presents additional evidence in the form of affidavits or otherwise to challenge the court's jurisdiction.[48] In evaluating a facial attack, the court "must accept the factual allegations in the complaint as true,"[49] and "apply a standard patterned on Rule 12(b)(6)."[50] When evaluating a factual attack, "a district court may not presume the truthfulness of the complaint's factual allegations."[51] Instead, "[a] court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."[52] Here, Defendants make a factual attack as they present and cite additional evidence outside of the Complaint to support their standing arguments.

---

[46] *See VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1147 n.4 (10th Cir. 2017) (citing and quoting various sources for the proposition that dismissal for lack of constitutional standing should be granted under Rule 12(b)(1) while dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)); *The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (citations omitted) ("[A] party must have constitutional standing[,] which is jurisdictional."); *Hill v. Vanderbilt Cap. Advisors, LLC*, 702 F.3d 1220, 1224-25 (10th Cir. 2012) ("Our court has repeatedly characterized standing as an element of subject matter jurisdiction.").

[47] *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022).

[48] *Muscogee (Creek) Nation v. Okla. Tax. Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

[49] *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017).

[50] *Garling v. EPA*, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017).

[51] *Rural Water Dist. 2 v. City of Glenpool*, 698 F.3d 1270 n.1 (10th Cir. 2012) (citing *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995)).

[52] *Id.* (citing *Holt*, 46 F.3d at 1003).

## ANALYSIS

Defendants argue Plaintiffs' claims should be dismissed because (1) Plaintiffs lack standing; (2) each claim is insufficiently pleaded and fails as a matter of law; and (3) the claims are barred by the economic loss rule.[53] Because the court determines Plaintiffs do not have constitutional standing, the court does not reach Defendants' other arguments.

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."[54] For a federal court to exercise jurisdiction over an action, "the party bringing the suit must establish standing."[55] To determine whether Plaintiffs have established standing at this stage of the litigation, the court assumes Plaintiffs' claims have legal validity,[56] and the court looks to whether Plaintiffs have adequately pleaded the following elements: (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable judicial decision.[57] Relevant here, Plaintiffs have failed to plead an injury in fact that is causally connected to the misconduct alleged.

An "injury in fact" is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical.[58] The Supreme Court has explained "certain harms readily qualify as concrete injuries under Article III" with "[t]he most

---

[53] *Motion* at 4, 10, 18, 25–26.

[54] *Lujan*, 504 U.S. at 559–61.

[55] *The Wilderness Soc.*, 632 F.3d at 1168 (citations omitted).

[56] *Id.* (citation omitted).

[57] *See Lujan*, 504 U.S. at 560–61 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." (citations omitted)).

[58] *Id.* at 560.

obvious" being "traditional tangible harms, such as physical harms and monetary harms."[59] And because injury in fact is a constitutional requirement, legislatures "cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."[60]

Indeed, issues related to the concreteness of an injury can arise when federal and state legislatures enact legal prohibitions and obligations and create causes of action for plaintiffs to sue those who violate those legal prohibitions or obligations.[61] "[U]nder Article III, an injury in law is not an injury in fact.  Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."[62]  Often, statutorily created injuries are "intangible," but these injuries can still be concrete for purposes of Article III standing.[63]  The most obvious of these are "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion."[64]

Here, Plaintiffs seek to obtain money damages under the federal RICO statute and other Utah statutes for Defendants' misrepresentations related to their abilities and qualifications to secure the ERTC on Plaintiffs' behalf.  But even assuming Plaintiffs' claim has legal validity—as the court must at this stage—the court agrees with Defendants that Plaintiffs have not alleged

---

[59] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

[60] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citations omitted).

[61] *TransUnion LLC*, 594 U.S. at 426–27.

[62] *Id.* at 427.

[63] *Id.* at 425.

[64] *Id.* (citations omitted).

an injury in fact.[65]  The fact that Defendants may have violated a federal or state statute does not independently confer standing upon Plaintiffs.  Moreover, Plaintiffs specify in their briefing what their alleged injury entails: in exchange for filing the Form 941-X on their behalf, Plaintiffs agreed to pay Defendants 15% of the ERTC obtained, ultimately totaling $351,303.31.[66]  And despite "failing to provide the services adequately or correctly," and despite Plaintiffs having to return a portion of the recovered credit back to the IRS to avoid any penalties or adverse government action, "Defendants still have this money."[67]  Plaintiffs repeatedly specify that the ERTC commission paid to Defendants is their alleged injury and "is the money that Plaintiffs seek to recover" in this litigation.[68]  Critically, however, Plaintiffs admit they were never legally entitled to the ERTC to begin with—they never should have received a dollar from the IRS via the ERTC.[69]  And yet, by entering into contracts with ERCS, and by participating in the Voluntary Disclosure Program, Plaintiffs were allowed to retain a percentage of the total credit received.  It is undisputed that Plaintiffs are net positive as a result of entering into the contracts with Defendants, even when accounting for their fee paid to Defendants and Plaintiffs' participation in the Voluntary Disclosure Program.[70]  Thus, Plaintiffs financially benefited from any fraud or statutory violation committed by Defendants as they received money they were never entitled to receive, and Defendants' retention of a portion of that money cannot constitute a financial injury to Plaintiffs in light of the asserted claims.[71]

---

[65] *Id.* (citation omitted).

[66] *FAC* ¶¶ 68, 77, 108.

[67] *Opposition* at 9.

[68] *Id.* at 10.

[69] *FAC* ¶ 95 ("It was subsequently determined that Plaintiff does not qualify for the ERTC.").

[70] *Motion* at 9–10; *see generally Opposition*; *Reply* at 5.

[71] Notably, Plaintiffs do not seek to recover the ERTC commission under a contract-related theory.

To the extent Plaintiffs attempt to rely on litigation costs to substantiate the fraud or initiate this action as an alternative injury to convey standing,[72] courts are clear that parties "cannot manufacture standing by incurring costs in anticipation of non-imminent harm."[73]  In other words, because Plaintiffs were never entitled to the ERTC, and because they are financially better off due to their contracts with Defendants, expending money to investigate and sue ERCS for fraud in filing their ERTC claim is not an alternative basis to establish an injury in fact.  In light of these circumstances and the asserted claims, and by relying on Defendants' retention of the ERTC commission as their alleged injury, Plaintiffs have failed to demonstrate an injury in fact based on Defendants' statutory violations.  Without standing, the court does not have jurisdiction to hear Plaintiffs' case.[74]  Accordingly, it must be dismissed.

## CONCLUSION

For the reasons explained above, Defendants' Motion is GRANTED,[75] and Plaintiffs' Complaint is DISMISSED.[76]  The Clerk of Court is directed to close the case.

SO ORDERED this 22nd day of July 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[72] *FAC* ¶¶ 109–11.

[73] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 422 (2013).

[74] *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) ("Absent a plaintiff with constitutional standing, federal courts lack jurisdiction." (citation omitted)).

[75] Dkt. 28.

[76] Dismissals for lack of subject matter jurisdiction are without prejudice.  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).